**GERARD v. SCOTT et al.**

No. 9979.

Circuit Court of Appeals, Ninth Circuit.

May 7, 1942.

Rehearing Denied June 8, 1942.

---

William H. Neblett and E. W. Miller, both of Los Angeles, Cal., for appellant.

Kenneth K. Wright, of Los Angeles, Cal., for appellee A. M. Johnson.

Joseph Choate, of Los Angeles, Cal., for appellee Walter Scott.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Appeal from a portion of a judgment of the United States District Court denying plaintiff's claim of a 22½% interest in certain real property commonly known as "Death Valley Scotty's Castle". Jurisdiction is based upon diversity of citizenship plus the requisite jurisdictional amount.

The facts upon which the plaintiff (appellant herein) sought to establish his claim to the "Castle" are as follows:

From 1902 to 1907 the appellant furnished defendant Walter Scott, sometimes known as "Death Valley Scotty" with a total of $10,000.00, to be used by Scott in locating and developing mineral deposits. Prior to August 9, 1907, difficulties arose between Scott and appellant and negotiations for the settlement thereof were conducted for some time. As a result of these negotiations appellant and Scott settled their difficulties by entering into an agreement dated August 9, 1907, pertinent parts of which read as follows:

"Whereas, the said Julian M. Gerard has heretofore entered into various agreements with said Walter Scott wherein and whereby the said Walter Scott, in consideration of moneys advanced to him by the said Gerard, agreed to and did convey unto the said Gerard an undivided one-half interest in all mining claims discovered, located, or to be located or discovered by the said Walter Scott in the States of California and Nevada and elsewhere; and

"Whereas, differences having arisen between the parties hereto with relation to said contracts, the party of the first part (Gerard) is willing to modify the contracts heretofore entered into between the parties heretofore as hereinafter set forth,

"(1) Now, therefore, the party of the second part (Scott) * * * hereby assigns and sets over to the said party of the first part an undivided twenty-two and one-half (22½) percent interest in all claims, locations, discoveries and water rights discovered, located or to be located or discovered by the party of the second part in his name or otherwise, in the State of California, Nevada and elsewhere. * * *

"(2) And the party of the first part, in consideration of the covenants and agreements hereinbefore entered into by the party of the second part, does * * * agree to take and accept an undivided twenty-two and one-half (22½) percent interest in all mining claims located or to be located, discovered or to be discovered by the said party of the second part, in lieu of the one-half interest mentioned in the aforesaid conveyances above mentioned, whereby the party of the second part did convey to the party of the first part an undivided one-half interest in all mining claims located or discovered or to be located or discovered by the said party of

the second part in the States of California and Nevada, and hereby releases the said party of the second part from any claims which he, the said Gerard, has or may have against the said Scott on account of any and all previous conveyances, assignments, bills of sale, and grubstaking agreements, and for all moneys which the said Gerard has heretofore advanced to the said Scott, except as herein set forth, and on account of any ore which the said Scott may have removed and converted to his own use from the claims in which the said Gerard has an interest. * * *"

The performance of this agreement on the part of Scott was guaranteed by the defendant Johnson, who had theretofore on May 29, 1906, been conveyed an undivided one-half interest "in and to all minerals theretofore or thereafter located or discovered by" the defendant Scott.

About the year 1915, the defendant Johnson purchased the claimed interests of certain persons who resided upon property known as the Upper and Lower Grapevine Ranches, and he and the defendant Scott commenced to live and thereafter continued to live thereon. About the year 1920, certain improvements and structures now known as "The Castle", were commenced on said property. The principal buildings and structures were completed about the year 1933. The trial court found, and there is evidence to support the finding that "the money used for the making of such improvements or the building of such structures was not in any way realized or obtained from any mine, location, claim or discovery of the defendant Scott, nor were they made or constructed with the proceeds of any such mine, location, claim or discovery".

On October 3, 1927, the defendant Scott caused to be delivered to the plaintiff a notice which Scott had executed on June 6, 1927, reading as follows:

"I, Walter Scott, of Inyo County, California hereby notify Julian M. Gerard of New York City, State of New York, that I herewith cancel, terminate, dissolve, annul and end all of my contractual relations and all other relations with said Julian M. Gerard spoken or implied, of every nature, kind and description whatsoever, including all grubstake contracts. * *. *"

On February 11, 1933, the "Castle" property, together with other property, was withdrawn from entry, by reason of an Executive proclamation (47 Stats. at L., p. 2554, No. 2028). Subsequent to this Executive proclamation, a bill "To Grant a patent to Albert M. Johnson and/or Walter Scott" was introduced by Mr. Englebright in the House of Representatives on January 3, 1935, and on that day was referred to the Committee on Public Lands (House Resolution 2476, Congressional Record Vol. 79, Part I, page 88). On February 21, 1935, the Committee on Public Lands transmitted a copy of the proposed bill to the Honorable Harold L. Ickes, Secretary of the Interior, and requested a report thereon. Secretary Ickes made an investigation of the facts relative to the bill, and on April 3, 1935, made a written report to the Chairman of the Committee on Public Lands, which read in part (See Report No. 899, House of Representatives, 74th Congress, First Session, which embodies the report of Secretary Ickes):

"This proposed legislation would authorize the Secretary of the Interior to grant a patent to Albert M. Johnson and Walter Scott ('Death Valley Scotty') for certain lands included in the Death Valley National Monument, Calif., either upon payment therefor at the rate of $1.25 per acre or under applicable public land laws. The lands proposed to be made the subject of this authorization have been located upon for some time by 'Death Valley Scotty'. Improvements variously estimated to be valued at from $250,000 to $2,000,000, have been built on the land by Scotty and Mr. Albert M. Johnson, of Chicago, Ill. It is indicated that the development of the land was undertaken in good faith by these parties with the hope of eventually securing title to the land either through the filing of public-land scrip or under public-land laws. * * *

"As a matter of policy in connection with legislation of this nature, this Department would prefer to have a provision included reserving to the United States all minerals the land may contain."

The Committee on Public Lands and Surveys to whom the bill was referred reported favorably thereon, and the bill was later passed by the House of Representatives and the Senate and approved by the President on August 22, 1935, United States Statutes, Vol. 49, page 2159. In accordance with the request of the Secretary of the Interior, the Act contained a provision

that the patent to be issued to Scott and Johnson "shall contain a reservation to the United States of all the minerals the land may contain, together with the right to prospect for, mine, and remove the same * * *".

On September 10, 1935, Scott and Johnson wrote to the Secretary of the Interior and requested the issuance of the patent provided for in the Act in the name of Albert M. Johnson alone. Johnson transmitted his check in payment of $1.25 per acre to the United States Land Office, and the patent was issued in his name on November 17, 1937.

The trial court found, and the finding is supported by the evidence, that the money used by the defendant Johnson in purchasing said property "was not money realized or obtained from any mine, location, claim or discovery of the defendant Scott."

The plaintiff-appellant in his amended complaint sets up five causes of action, all of which are based on the agreement of August 9, 1907. It is not contended by the plaintiff that the money which he advanced to Scott was used in the purchase and improvement of the "Castle", and his claim of an interest in the property is not upon that ground. Nor is the plaintiff contending that money derived from mining claims in which he had an interest went into the Castle property. The sole contention of the appellant is stated by him in his opening brief to be: "There is one main question involved on this appeal, viz: In view of the determination and finding of the Secretary of the Interior * * * was not the plaintiff entitled to judgment, in addition to the relief by way of an accounting provided for therein, for a twenty-two and one-half (22½) per cent interest in 'The Castle' property * * * under the express terms and provisions of the settlement agreement of August 9, 1907, * * *".

In support of his contention that he is entitled to a 22½% interest in The Castle property by virtue of the agreement, two main arguments are made. The first is that the agreement is "sufficiently broad in its terms to include not only mining locations and claims, but also any and all discoveries and locations of every kind", and the second is that the finding of the Secretary of the Interior to which we have referred above is a "final determination of a vital fact, binding on the world and the courts, viz.: that Death Valley Scotty had, prior to the

application for the legislation authorizing the patent, 'located upon' the lands described therein (within the meaning of the general term 'location' in the agreements * * *)".

As to the plaintiff's first argument, that the agreement is sufficiently broad to include not only mining locations, but also any and all discoveries and locations of every kind, we do not agree. Taking the agreement as a whole, which of course we must do, it becomes clear that it is limited in its scope to "mining" locations and the like. It is true that the paragraph (1) of the agreement which we have above quoted refers only to "claims, locations, discoveries and water rights discovered, located or to be located or discovered" by Scott, nevertheless this paragraph is immediately followed by paragraph (2) which recites that Gerard agrees to accept the 22½% interest in "all mining claims located or to be located, discovered or to be discovered" by Scott in settlement of all claims which he might have against Scott for moneys theretofore advanced. Elsewhere in the agreement the claims and locations are referred to as "mining claims".

Nor do we agree with the plaintiff-appellant in his contention that the findings of the Secretary of the Interior are conclusive of the fact that "The Castle" was a "location" within the meaning of the agreement as we have above construed it.

On the contrary, it appears that the Secretary of the Interior did not regard the property as mining property, as is evident from the recital that the development of the property was undertaken in good faith with the hope of securing title to the property through the filing of public land scrip or under public land laws. Title to mining claims cannot be obtained through the filing of public land scrip or under the public land laws, but only under and pursuant to the mining laws of the United States. 43 U.S.C.A. § 201. A further indication that the Secretary of the Interior did not regard Scott as having any mineral rights in the property, is found in the recommendation that the patent to be issued contain a reservation to the Government of all mineral rights in the property.

There is nothing in the Secretary's findings to aid the plaintiff in his attempt to establish that this property fell within the

express terms of his agreement with Scott. Nor is there any other evidence in the record to support the plaintiff's claim.

Finding no error in the decision of the District Court, it is affirmed.